# EXHIBIT M

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NORTH CAROLINA
### SOUTHERN DIVISION
### CIVIL ACTION NO.: 7:22-CV-00025-FL

| | |
|---|---|
| ADAM JONES d/b/a TRIPLE J FARMS and LAWVER INSURANCE & FINANCIAL SERVICES d/b/a INSURANCE OF THE CAROLINAS, <br><br> Plaintiffs, <br><br> v. <br><br> CRUM & FORSTER SPECIALTY INSURANCE COMPANY, <br><br> Defendant. | **DEFENDANT CRUM & FORSTER SPECIALTY INSURANCE COMPANY'S DESIGNATION AND DISCLOSURE OF EXPERT WITNESS** |

Pursuant to Rule 26(a)(1) of the Federal Rules of Civil Procedure and the Case Management Order in this action, Defendant Crum & Forster Specialty Insurance Company ("Defendant"), hereby identifies the following expert witness it intends to call at the trial of this matter:

> Ernest N. Csiszar
> 1579 Kathwood Drive
> Columbia, SC 29206
> *Mr. Csiszar may be contacted through undersigned counsel.*

Mr. Csiszar's expert report, its referenced exhibits, and all other information required to be produced pursuant to Rule 26(a)(2), is attached hereto as Exhibit 1.

Defendant reserves the right to amend or supplement this Designation and Disclosure of Expert Witness and/or to designate supplemental experts as discovery is ongoing.

*[Signature block on following page]*

1

This the 13th day of September, 2022.

JAMES, McELROY & DIEHL, P.A.

By: /s/ Alexandra B. Bachman
    Adam L. Ross, NC State Bar No. 31766
    Alexandra B. Bachman, NC State Bar No. 54746
    525 N. Tryon Street, Suite 700
    Charlotte, North Carolina 28202
    Telephone:  (704) 372-9870
    Facsimile:  (704) 348-0800
    Email: aross@jmdlaw.com
           abachman@jmdlaw.com

    Kristin V. Gallagher (*pro hac vice* forthcoming)
    kristin.gallagher@kennedyslaw.com
    Martin Harms (*pro hac vice* forthcoming)
    martin.harms@kennedyslaw.com
    Kennedys CMK LLP
    120 Mountain View Boulevard
    Basking Ridge, NJ 07920
    Tel: (908) 848-1220

    *Counsel for Defendant*
    *Crum & Forster Specialty Insurance Company*

## CERTIFICATE OF SERVICE

I hereby certify that the undersigned has on this date served the foregoing **DEFENDANT CRUM & FORSTER SPECIALTY INSURANCE COMPANY'S DESIGNATION AND DISCLOSURE OF EXPERT WITNESS** and has been served via e-mail and First Class U.S. Mail, sufficient postage prepaid, addressed to the following:

Michael T. Medford
Manning, Fulton & Skinner, P.A.
3605 Glenwood Avenue, Suite 500
P.O. Box 20389
Raleigh, NC 20389
Fax: 919-325-4618
Email: medford@manningfulton.com
*Attorneys for Lawver Insurance and Financial Services d/b/a Insurance of the Carolinas*

R. Steven DeGeorge
Spencer T. Wiles
Robinson Bradshaw & Hinson, P.A.
101 North Tryon Street, Suite 1900
Charlotte, NC 28246
Fax: 919-328-8790
Email: sdegeorge@robinsonbradshaw.com
swiles@robinsonbradshaw.com
*Attorneys for Adam Jones d/b/a Triple J Farms*

This the 13th day of September, 2022.

**JAMES, McELROY & DIEHL, P.A.**

By: /s/ Alexandra B. Bachman
Adam L. Ross
Alexandra B. Bachman
525 N. Tryon Street, Suite 700
Charlotte, North Carolina 28202
Telephone:  (704) 372-9870
Facsimile:  (704) 348-0800
Email: aross@jmdlaw.com
abachman@jmdlaw.com

Kristin V. Gallagher (*pro hac vice* forthcoming)
kristin.gallagher@kennedyslaw.com
Martin Harms (*pro hac vice* forthcoming)
martin.harms@kennedyslaw.com
Kennedys CMK LLP
120 Mountain View Boulevard
Basking Ridge, NJ 07920
Tel: (908) 848-1220

*Counsel for Defendant*
*Crum & Forster Specialty Insurance Company*

# EXHIBIT 1

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NORTH CAROLINA
### SOUTHERN DIVISION

ADAM JONES d/b/a TRIPLE J FARMS,
and LAWVER INSURANCE &
FINANCIAL SERVICES d/b/a

INSURANCE OF THE CAROLINAS,

               Plaintiffs,

v.

CRUM & FORSTER SPECIALTY
INSURANCE COMPANY,

               Defendant.

CIVIL ACTION NO.: 7:22-CV-00025-FL

## SEPTEMBER 13, 2022

## EXPERT REPORT OF ERNEST N. CSISZAR

**TABLE OF CONTENTS**

I.     INTRODUCTION .................................................................................................... 3

   A.   Summary of Allegations ................................................................................ 3

   B.   Summary of Qualifications ........................................................................... 3

   C.   Materials Reviewed and Work Performed....................... ....................................6

II.    SUMMARY OF OPINIONS ..................................................................................... 6

III.   THE INSTITUTIONAL FRAMEWORK FOR THE PURCHASE OF FARM EQUIPMENT INSURANCE PRODUCTS.......................................................................................... 7

IV.   AN OVERVIEW OF THE EVIDENCE IN THIS CASE.............................................................11

V.   ANALYSIS AND OPINIONS REGARDING THIS CASE ............................................... 15

VI.   COMPENSATION ............................................................................................... 21

# I. INTRODCTION

1. My name is Ernest N. Csiszar. I have been retained by Defendant Crum & Forster Specialty Insurance Company ("Crum & Forster") to render opinions in this case based on my experience as an insurance executive, insurance regulator, academic engaged in teaching insurance and risk management, and consultant to various governmental, corporate, associational, and consulting entities regarding insurance-related issues. A copy of my curriculum vitae is attached as Exhibit 1. A summary of my service as an expert in other cases is attached as Exhibit 2.

## A. Summary of Allegations

2. This case pertains to damage to farm equipment sustained by Plaintiff Adam Jones d/b/a Triple J Farms ("TJF") and caused by a fire that occurred on March 20, 2021. The Plaintiff Lawver Insurance & Financial Services d/b/a Insurance Of The Carolinas ("IOC") is a retail broker retained by TJF to procure insurance coverage for TJF's farm equipment.

3. Plaintiffs allege that an insurance policy numbered BAK-56503-2, issued by Crum &Forster, and covering a policy period from November 13, 2020 to November 13, 2021, should be reformed to cover the farm equipment damaged by the fire, that damages be paid, and that the Defendant's denial of the Plaintiffs' claim constitutes an unfair trade practice. While the main thrust of the Plaintiffs' lawsuit is to seek reformation of the insurance policy, this case also raises issues pertaining to the role, duties, and responsibilities that a retail broker has with respect to its client as well as the duties and responsibilities that the client itself has.

4. Accordingly, in the preparation of this report, I have drawn on my decades of relevant experience in, and knowledge of, the insurance industry, its practices, norms and standards, and its regulatory environment. I have reviewed the materials referenced in Section C hereafter, and I am familiar with and understand the issues raised in this case well enough to believe that my opinions can assist the trier of fact in this case.

## B. Summary of Qualifications

5. I have worked in the insurance industry for over 30 years. I first became familiar with the industry as a law student at The University of Windsor Law School, where I took several insurance courses, from introductory to advanced. I also handled various insurance matters early in my career as a young lawyer.[1]

---

[1] Clients included Co-operators Insurance Companies of Guelph (CIAG Canada), Commercial Union (Canada), and Allstate (Canada).

6. I left private law practice several years later and joined Holborn Holding Corporation ("Holborn") as a partner and Managing Co-Director. Holborn was in the business of financing large commercial and industrial construction projects. A significant part of my responsibilities related to the risk management aspects of its projects, including negotiating the purchase of complex insurance and reinsurance coverages from organizations like Lloyd's of London, XL Reinsurance of Bermuda, Swiss Re, and other insurers and reinsurers. I also had responsibility as Chief Executive for a captive insurance company that Holborn formed during my tenure.

7. Holborn was eventually sold and, in a change in career, I was invited to join the faculty at the University of South Carolina School of Business ("USC"), both as a candidate for a doctorate and as Visiting Professor, and later as Clinical Professor of Insurance. I started teaching graduate and undergraduate courses, first in business strategy, and later in property insurance, life insurance, and risk management.

8. While teaching at USC, I formed a consulting group – CG Associates Inc. ("CG"). One of its first consulting jobs was an engagement to do a complete a review with recommendations for all operations of Seibels Bruce Group Inc. ("SBG"), a publicly listed insurance holding company that operated on a national scale. SBG sold a variety of property and casualty products (including farm equipment coverages through an excess and surplus lines subsidiary) as well as life insurance products. The company also operated a brokerage for excess and surplus lines products, as well as reinsurance operations, and had formed one of America's first successful insurance information systems development companies.[2] Founded in 1869, it was one of America's oldest insurance companies still in operation but found itself in financial difficulties, the result of poorly performing acquisitions and 1992's Hurricane Andrew.

9. Upon concluding my report and recommendations, SBG's Board of Directors invited me to join the Board and, a few months later, the Board nominated me as President and Chief Executive.[3] My tenure at SBG allowed me to become familiar with practically every aspect of operating within the property and casualty and life insurance industries. I also became familiar with insurance regulatory practices, industry standards and norms, and the customs and the practices within the insurance industry as SBG's insurance subsidiaries were licensed to do business in every state and territory of the United States.

10. After several years with SBG, during which the company engineered a successful turnaround, I was appointed by the Governor of South Carolina to be the Director of the South Carolina Department of Insurance ("SCDOI"). I served for six years, during which time I also became President of the National Association of Insurance Commissioners

---

[2] Policy Management Systems Company, Inc. ("PMSC").

[3] I became the President and Chief Executive Officer of each of its subsidiaries as well.

("NAIC"), an organization that includes each state's and territory's lead insurance regulator.

11. As Director of the SCDOI, I was responsible for the supervision and regulation of all sectors of the insurance industry in the state, including property and casualty insurance, life insurance, and health insurance, as well as all distribution channels, including agencies and brokerages. In effect, the SCDOI's regulatory jurisdiction extended to all regulated entities, including all insurance companies, all products, and all insurance distribution channels within the state. As a result of my active participation at the NAIC, I developed familiarity with industry standards, regulatory regimes, and best practices in other states.

12. I was also the NAIC's representative to the International Association of Insurance Supervisors ("IAIS") and a member of IAIS' Executive Committee. IAIS is membership organization of insurance supervisors and regulators from more than 200 countries, constituting 97% of world-wide insurance premiums. Its main function is to set global standards for the insurance and reinsurance industry. I chaired IAIS' Reinsurance Committee and its Insurance Securitization Committee. I also functioned as insurance advisor to the Basel Committee's Financial Stability Forum - a group that is part of the Bank for International Settlements ("BIS"), and as advisor on insurance matters to the Organization for Economic Co-operation and Development ("OECD").

13. After six years as Director of SCDOI, I was invited to become President and CEO of the Property and Casualty Insurers Association of America ("PCIAA"), an association comprised of over 1,200 insurance companies and a host of associate brokerage members. One of PCIAA's functions was to provide a forum wherein its members could address all issues pertaining to their own operations and their distributors' operations.[4] The idea was to let the industry discuss and develop industry norms and standards, best practices, and benchmarks with respect to the entire supply and distribution chain of insurance operations.

14. I have also held the post of Insurance Director with Bridge Strategy Group, LLC ("Bridge"), a Chicago-based consulting group, that advised a variety of insurance clients, including several large brokerage operations.

15. I have frequently testified before Congressional committees and before state legislatures on insurance issues. I have also served as an advisor on insurance-related initiatives of the United States Agency for International Development ("USAID"), a unit of the U.S. Department of Commerce, and I have worked with industry and regulators on USAID's behalf in several foreign countries.[5]

---

[4] Except the pricing of their products as such a discussion would violate antitrust laws.

[5] These included Poland, Hungary, Kazakhstan, Egypt, Albania, Morocco, Mexico, and China.

16. I have been a guest speaker at many events organized by insurance industry organizations, including the American Association of Managing General Agents ("AAMGA"), Insurance Marketing Standards Association ("IMSA"), the Independent Agents and Brokers of America ("IAABA"), South Carolina Association of Insurance Agents ("SCAIA"), National Association of Professional Insurance Agents ("PIA"), the American Council of Life Insurers ("ACLI"), the National Alliance of Life Companies ("NALC"), the National Conference of Insurance Legislators ("NCOIL"), and others.

17. I have been a member of the Board of Directors and Chair of the Audit Committee of several insurance companies, and I continue to serve on the Board as Audit Chair for a Florida-based property and casualty insurance company. I am also the Director responsible for risk management, insurance coverages included, and the Board's Chair of the Compensation Committee at a diversified Fortune 500 New York Stock Exchange ("NYSE") listed public company. The company acts as a specialty contractor for large communications projects, oil and gas transmission, electrical and solar power projects, and large construction projects throughout the United States, Canada, and Mexico. I advise the company and its Board on its choice of risk management techniques for its projects. Overall, I continue to be engaged with the industry, property and casualty insurance, life insurance, and reinsurance primarily, through consulting and expert witness work.

## C. Materials Reviewed and Work Performed

18. In preparation for this report, I have drawn on my decades of relevant experience in the industry, reviewed relevant insurance policies and underwriting files, reviewed the Plaintiffs' Expert's Report, as well as other documentary evidence. A list of the materials considered in preparation of this report is attached as Exhibit 3.

# II. SUMMARY OF OPINIONS

Based on my experience and investigation I have reached the following opinions:

**OPINION 1:** Defendant Crum & Forster relied on IOC's submission of the farm equipment items to be covered, and any mistake in identifying the correct farm equipment to be covered is solely the mistake of one or both Plaintiffs and not Crum & Forster.

**OPINION 2:** Defendant Crum & Forster acted with integrity, honesty, promptness, thoroughness, and sincerity in its conduct with the Plaintiffs.

**OPINION 3:** Plaintiffs had an obligation to provide correct and accurate information to Crum & Forster during the application process, and to read and review the Crum & Forster insurance policy in a timely manner to address any potential issues.

**OPINION 4:** Given the circumstances of this case, reforming the insurance policy post-loss would undermine fundamental aspects of insurance, and would have a profound effect on the availability and pricing of reinsurance and on insurance regulation.

19. The bases for these opinions are in the remainder of my report. I reserve the right to supplement my opinions or express additional opinions based on information yet to be revealed.

# III. THE INSTITUTIONAL FRAMEWORK FOR THE PURCHASE OF FARM EQUIPMENT INSURANCE PRODUCTS

20. **Admitted vs. non-admitted insurance carriers:** The state-based US regulatory framework permits two types of insurance carriers to serve the property and casualty ("P&C") markets. Admitted carriers serve standard markets such as automobile and homeowners' insurance, while non-admitted carriers (commonly known as Excess and Surplus – "E&S" – insurers) serve primarily specialty insurance products, farm equipment insurance being a good example of the latter.[6] Farm equipment insurance products are typically available for purchase in the non-admitted E&S market.

21. **Agents vs. brokers in general:** Both admitted and non-admitted markets are accessed through intermediaries. The most common intermediaries are retail agents and retail brokers.[7] There is a significant difference between the two. Agents are contracted to represent one or more insurance companies. Brokers are contracted to represent a purchasing client and they owe their duties and responsibilities to that purchasing client.

22. Brokers are independent contractors who represent a client interested in procuring insurance. They usually solicit offers from several different insurance companies on their client's behalf.[8] They seek to generate options for their clients by obtaining more than one quote from other brokers or from multiple insurance carriers. It is by no means unusual for an insurance agency to also assume the role of broker for a client. Both agents and brokers must be licensed by state insurance departments.

---

[6] The two types of carriers are governed by two different regulatory regimes, the prime differences being the pre-approval of rates and forms that admitted carriers must conform to and, in addition, the protection their policyholders gain from access to guarantee funds in the event of a liquidation. On the other hand, non-admitted insurance carriers can offer greater pricing and coverage flexibility.

[7] There are other types of intermediaries such employees engaging in direct sales, wholesale brokers, managing agents, managing general agencies, and cover holders.

[8] Independent agents typically represent several different insurance companies and act as an agent for each.

23. **Retail brokers and wholesale brokers**: Retail brokers deal directly with the purchasing client. They take their instructions from their client and collect the information necessary to underwrite the risk in question. The result is typically a packaged submission of material information relevant to the risk to be covered, which then becomes the basis for soliciting quotes.

24. While some transactions require several intermediary steps, more commonly the retail broker forwards the submission to one or more wholesale brokers for a quote. Wholesale brokers then become intermediaries between the retail broker and insurers willing to underwrite the risk and quote the terms for doing so. Many of these wholesale brokers develop close relationships with particular insurance carriers and have regular access to carriers that are known to have the knowledge and capacity to underwrite the particular piece of business. There is usually little to no contact between the wholesale broker and the purchasing client. The wholesale broker's contact is with the retail broker.

25. **The duties and responsibilities of a retail broker to his/her client:** The broker's duty is to procure insurance coverage for his or her client, to do so in a timely manner, and to promptly inform the client if unable to do so. In effect, a retail broker's task is to prepare an accurate and complete submission regarding the risk to be covered, seek quotes, and get a binder from an insurer. The quotes and the binders – and the insurance policy issued in line with a quote and binder – are only as good as the information that the retail broker conveys to the wholesale broker, as the risk is ultimately underwritten by an insurer based on that information.

26. Accuracy, detail, thoroughness, and attentiveness to the information contained in the retail broker's submission are a "sine qua non" in this process. They are essential and exceedingly material to an insurer's inclination and ability to underwrite the risk. Insurers rely on this information in deciding whether to accept or decline a risk. How else can an insurer assess the extent of the risk, the timing of potential losses, and the terms and pricing of the risk without such information?

27. **The duties and responsibilities of the client:** The client is not without its own set of responsibilities. The first is a practical one. If the client's preferred retail broker cannot deliver the policy required, the client can shop around to get what it wants. Once coverage is bound, it is the affirmative duty of the client to read the policy and determine whether it complies with his instructions to the broker and to reject it if it does not provide the desired coverage. This is also why states allow for a grace period to cancel the purchase of the policy if the client is unsatisfied with the coverage. It is incumbent upon the client to check a policy thoroughly. If any clarifications are needed, it is the client's responsibility to ask the broker. It is also the duty of the client to keep his retail

broker informed of any changes in circumstances that might impact the coverage provided.

28. **The distinctive characteristics of E&S brokers:** In contrast to the admitted market where a general broker's license suffices to do business, our insurance regulatory regime mandates the possession of a separate E&S license before a broker can procure E&S insurance coverages. In effect, all purchases of E&S products must flow through an E&S licensed broker ("surplus lines broker") who is authorized to secure coverage for the ultimate purchasing client from an E&S insurance carrier. Much like wholesale brokers, surplus lines brokers function as intermediaries with little to no contact with a purchasing client. They place the business brought to them by other brokers.

29. **The E&S market in practice:** Surplus lines insurers write coverages in states where they are permitted to operate on a surplus lines basis. The state in which the insured resides, North Carolina for instance, requires the E&S insurer to appoint a domestic surplus lines broker before any E&S carrier can solicit, sell, or negotiate a surplus lines product. While E&S business can be generated by any number of sources, it can only be placed with an E&S insurer through its appointed domestic surplus lines broker. The domestic surplus lines broker is the one who is held accountable by the state's department of insurance for compliance with all the requirements of that state's surplus lines laws and regulations.

30. **The types of risks covered in the E&S market:** While there are plenty of intermediaries willing and able to do business in the E&S market, the fact of the matter is that there are typically very few E&S carriers that are willing and able to write a given risk. Surplus lines carriers tend to underwrite coverages for the kinds of difficult to place commercial risks that the admitted market avoids, including the kinds of risks that one finds on a farm. In other words, the E&S market is designed to accommodate unique, hard to place, complex, capacity-constrained, or distressed risks that cannot be covered in the admitted market. Most E&S insurance carriers tend to specialize in a few niches where they can understand and properly price and tailor coverage to suit their risk appetite.

31. **The role of underwriting in E&S insurance:** Insurance and underwriting are intimately linked. Underwriting is about risk selection and risk exposure classification. If an insurance company is to earn a reasonable profit, it must set a proper rate to cover at least its potential future losses and expenses. While a company's actuaries play a vital role in determining what characteristics of a risk to use to forecast future accidental losses, it is a company's underwriters who decide how to apply those characteristics to a given risk. The role of underwriting is to accurately classify insurable risks according to rating variables so that a company can charge the right premium for the right risk.

Overall, the objective is to minimize the difference between actual losses and expected losses for each insured risk.

Underwriting requires knowledge and understanding of a risk. The source of that knowledge and understanding for an underwriter is the information provided by the retail broker. That is why the accuracy of the information is so important. However, there are also other significant factors that an underwriter must consider. For instance, minimizing concentrations of exposures; identifying borderline business; assessing reinsurance coverage for the risk at hand; the pricing for that reinsurance coverage; the need for a senior underwriter's approval; possible exceptions; and other such considerations are among these.

Underwriting also serves to prevent adverse selection. For example, an underwriter must consider if one brand of farm equipment suffers from greater defects or breakdowns than, say, another brand, or if a brand uses parts that cost more to repair than those of another brand. The risk exposures must fit an insurance company's actuarially expected pattern which can change over time. It is a customary practice in underwriting farm equipment to require the retail broker to prepare and submit a schedule of the equipment to be covered. A piece of farm equipment that might have been attractive as a risk last year might not be quite as attractive today. It is, therefore, common industry practice to review and re-underwrite accounts from time to time as they come up for renewal as property risk profiles and risk appetites can change over time.

I would add that an insurance company's underwriting results are essential to its solvency. Hence, insurance regulators take a keen interest in a company's underwriting practices – and its concomitant claims practices - as part of monitoring and examining a company's capital and surplus, its risk-based capital ("RBC"), its financial performance, and its solvency.

32. **The impact of reinsurance on E&S underwriting and claims practices**: It is customary practice for insurance companies to buy reinsurance for their business. Reinsurance is insurance for insurers, and it is essential to maintaining a viable E&S market for consumers. One can indeed argue that there would be no E&S market without reinsurance.

While there are a variety of different reinsurance arrangements available to an E&S insurer, as a practical matter, the transfer of risk provides enhanced financial stability to an E&S insurer by spreading its risks. Moreover, insurance regulators are keen to know that a company is reinsured for its risks as it diminishes the risk of insolvency.

Insurers must report their claims payments and the circumstances which caused a claims payment for each reinsured claim to their reinsurers. Reinsurers routinely review, analyze and, indeed, audit an insurer's reinsured book of business, its underwriting guidelines, and its claims payments. Unacceptable risks, questionable claims payments, flawed underwriting guidelines or flawed claims handling processes, and regulatory concerns regarding an insurer are all matters of interest to a reinsurer because they impact pricing or, in the worst of cases, cessation of a relationship with the insurer.

Reinsurers are also concerned about their own concentration of risks. For example, too many farm equipment pieces of the same type, for instance, can create an abrupt halt on an insurer's ability to reinsure such a risk.

Matters of this nature will inevitably also attract the attention of insurance regulators as the presence of such questionable practices evinces potentially shoddy management, poor internal controls, and possibly impaired solvency on the part of the insurer.

# IV. AN OVERVIEW OF THE EVIDENCE IN THIS CASE

33. TJF engaged IOC as its retail broker to procure coverage for certain of TJF's farm equipment. Plaintiff IOC, in line with E&S practices as described above, prepared a submission package and, in October of 2019, requested quotes for insurance coverage for a 2014 Case Magnum tractor, serial number ZERD03302 from at least two surplus lines brokers, one of them being RT Specialty ("RT").[9]

34. RT responded with a quote based on the Defendant's underwriters' acceptance of the risk. TJF accepted the quote and Crum & Forster issued insurance policy number BAK-56503-1 covering the tractor for the period 11-13-2019 to 11-13-2020.

35. In May 2020, a 2020 New Holland tractor, Model C245, serial number JAFC245PKM4772, was underwritten by Crum and Forster at IOC's request and added to policy number BAK-56503-1 by endorsement.

36. In late May 2020, IOC informed RT that its client, TJF, was leasing two pieces of farm equipment, namely a 2013 AgCo Gleaner Combine, serial number RS7700DHTV7177, and a 2012 AgCo Gleaner Header, serial number 92500CHD1576.[10] RT provided a quote, again based on Crum & Forster's underwriting.

37. A few days later, IOC requested and received a quote from RT to add a 2013 New Holland Combine, Model CR7090, serial number YDG116796, at a value $150,000, to the policy.[11]

---

[9] The other broker, Johnson & Johnson, declined to quote.

[10] See Document Production IOC-0005.

[11] See Document Production IOC-0008 and 0009.

The combine was underwritten by Crum & Forster and added to the policy, effective June 5, 2020.[12] However, RT also informed IOC that if both the AgCo equipment and the New Holland combine were to be added to policy, the maximum Total Insurable Value ("TIV") limit of $500,000 would be exceeded.[13] It appears that, as a result, only the 2013 New Holland combine was added to the policy.

38. Eventually, the 2020 New Holland tractor, Model C245, serial number JAFC245PKM4772 was deleted from the policy by endorsement June 8, 2020, leaving the Case Magnum tractor and the 2013 New Holland combine on the Crum & Foster policy number BAK-56503-1 coverage schedule.

39. The evidence leaves the impression that there seems to have been a sense of uncertainty and confusion on the part of IOC personnel as to what farm equipment should be covered by Crum & Forster. In an internal e-mail dated June 9, 2020, between two staffers who appear to have managed the TJF account, Ms. Adelaide Henry, IOC's farm insurance specialist, writes to Ms. Libby Ashely, IOC's excess and surplus lines specialist, as follows:

> "Adam called and wants to know everything he's got insured. This is what I *think* we've got:
>
> A.   2014 Case Magnum Tractor $130,000
> B.   2020 New Holland C245 $81,000 (this is the tractor he's wanting removed)
> C.   2013 New Holland Combine Cr7090
> D.   2008 New Holland Combine Head 74C
>       Plus crop insurance which I will handle.
>       Is this right?" **(Emphasis in the original)**[14]

40. Clearly Ms. Henry was not right. Policy number BAK-56503-1 made no reference to covering a "2008 New Holland Combine Head 74C." No quote for a "2008 New Holland combine head 74C" had ever been requested by IOC and no "2008 New Holland combine head 74C" had ever been added to the policy. Moreover, the 2020 New Holland C245 tractor had already been deleted from the policy effective June 8, 2020. IOC had to turn to RT to find out what was covered. In response, RT advised IOC to review the policy and provided IOC with a copy of the policy with endorsements as an attachment to its e-mail to IOC.[15]

---

[12]  See Document Production IOC-0108.

[13]  See Document Production IOC-0009.

[14] See Document Production IOC-0132.

[15] See Document Production CF-00058.

41. There also seems to have been a lack of responsiveness, perhaps inattentiveness, on the part of IOC with respect to their own client TJF, as evidenced by an e-mail from the Plaintiff Adam Jones to Ms. Adelaide Henry and Ms. Libby Ashley, dated August 12, 2020:

    i. "This is My (sic) 3rd letter within 2 weeks.  Is everything ok with the insurance?"[16]

42. In a similar pattern, IOC failed to respond to RT's request, dated August 26, 2020, for a renewal submission with updated equipment information.[17] The same happened in October 2020.  With policy number BAK-56503-1 set to expire on November 13, 2020, RT repeated its request for updated equipment information on October 5, 2020. Again, there was no response from IOC. Thus, Crum & Forster policy number BAK-56503-1 did in fact expire without a timely renewal.

43. Eventually, on November 18, 2020 – days after the policy had expired – IOC sent RT a request for a "combine insurance renewal effective as of 11/13/20 if possible"[18].

44. RT, in turn, again requested specific updated equipment information on the renewal application. IOC responded with the following updated equipment information on November 23, 2020 – 10 days after policy number BAK-56503-1 had expired:

| SCH # | DESCRIPTION | | EXCL BLKT | ITEM VALUE | VALU- ATION | VALUATION DATE | PURCHASE DATE | OWN / LEASE | NEW / USED | % COINS |
|---|---|---|---|---|---|---|---|---|---|---|
| 01 | Combine | | | $180,000 | | | | | | % |
| ITEM # | MANUFACTURER | MODEL | YEAR | ID # / SERIAL # | | | CAPACITY | | AMOUNT OF INSURANCE | |
| 01 | AgCo Gleaner | Super 77 | 13 | RS77COD HTI 7I77 | | | | | $ | |
| SCH # | DESCRIPTION | | EXCL BLKT | ITEM VALUE | VALU- ATION | VALUATION DATE | PURCHASE DATE | OWN / LEASE | NEW / USED | % COINS |
| 02 | Header | | | $30,000 | | | | | | % |
| ITEM # | MANUFACTURER | MODEL | YEAR | ID # / SERIAL # | | | CAPACITY | | AMOUNT OF INSURANCE | |
| 02 | AgCo Gleaner | 9250T-30 | 13 | 9250CHD0157 | | | | | $ | |
| SCH # | DESCRIPTION | | EXCL BLKT | ITEM VALUE | VALU- ATION | VALUATION DATE | PURCHASE DATE | OWN / LEASE | NEW / USED | % COINS |
| | | | | $ | | | | | | % |

The updated information was clearly very specific as it listed specific AgCo equipment models, model years, values, and lengthy serial numbers.[19]

45. By email dated November 23, 2020, Ms. Ashley of IOC confirmed the detailed itemization of AgCo farm equipment by requesting that policy limits on the AgCo equipment needed

---

[16] See Document Production IOC-0121.

[17] See Document Production CF-00058.

[18] See Document Production IOC-0210.

[19] See Document Production CF-00103 – 00105.

to be lowered to $210,000 – that being precisely the combined value of the AgCo Gleaner and AgCo Gleaner Header.[20]

46. Based on IOC's updated equipment information, Crum & Forster underwriters approved issuing policy number BAK-56503-2 which covered the AgCo Gleaner and AgCo Header as submitted with a $210,000 limit for a policy period terminating November 13, 2021. No other equipment was covered under the policy.

47. On March 20, 2021, a fire destroyed the 2013 New Holland Combine, Model CR7090, serial number YDG116796 and a 2008 New Holland Header. Neither the combine nor the header was underwritten or scheduled for coverage under the Crum & Forster policy number BAK-56503-2 since IOC's updated equipment information had listed only an AgCo Gleaner and an AgCo Gleaner Header.

48. On March 22, 2021, IOC provided notice of a claim for damages to the 2013 New Holland Combine and 2008 New Holland Header. Crum & Forster assigned one of its claims adjusters to handle the claim. By April 9, 2021, Crum & Forster's internal investigation revealed that only an AgCo Combine and Header had been underwritten and scheduled for coverage under policy number BAK-56503-2.

49. It was apparent that IOC made a mistake in requesting that the AgCo equipment be covered, rather than New Holland equipment. It was not until April 13, 2021 that IOC informed RT of its mistake. Significantly, five months had passed since policy number BAK-56503-2 was underwritten and issued by Crum & Forster. The policy was almost half-way through its term and, the loss of the 2013 New Holland combine and 2008 New Holland header had occurred in the meantime.

50. On April 28, 2021, IOC requested that Crum & Forster agree to reform the policy to cover the 2013 New Holland Combine and 2008 New Holland Header. Importantly, the New Holland Header had never been listed on either policy number BAK-56503-1 nor in BAK-56503-2.

51. Crum & Forster denied the claim on May 11, 2021. However, Crum & Forster cancelled policy number BAK-56503-2 to the inception of the policy to allow TJF to get a full return of the premium. The premium return was transferred electronically by Crum & Forster to RT on April 21, 2021.

---

[20] See Document Production CF-00093.

## IV. ANALYSIS AND OPINIONS REGARDING THIS CASE

52. I submit that the evidence in this case points to much more than a minor clerical, typographical, or administrative error that would deserve correction or reformation. Getting the updated coverage information entirely wrong was a substantive and consequential error that touched the very core of property insurance. Insurers rely on the information provided to them by the broker to be able to underwrite a risk. That risk was entirely misdescribed by IOC in this case. Yet, an accurate description of what is being covered is the single most significant piece of information for an underwriter. How else can he or she assess the risk, set the terms of coverage, and price the policy?

53. To argue, as Plaintiff's expert does, that the rate structure per $100 of value would have been the same whether it be New Holland equipment or AgCo equipment simply doesn't address the real issue: what Crum & Forster underwrote was AgCo equipment and Agco equipment value only - not New Holland equipment and not New Holland equipment value. Moreover, no New Holland header was ever underwritten or insured. What if Crum & Forster had too high a concentration of New Holland farm equipment? What if its reinsurers were no longer willing to reinsure New Holland equipment? Just by accessing the Internet with the word "Combine" one can find hundreds of different combine models on the market, new and old, seemingly each with its own risk characteristics as far as size of the equipment,[21] prices and costs for parts and repair costs, breakdown frequencies, dealer support and so on.[22] In any event, to now claim that "Well, they would have underwritten the New Holland equipment at the same rate" is nothing more than post facto second-guessing and it is second-guessing with dirty hands since a loss has already occurred. Nor is it timely second-guessing. BAK-56503-2 was almost half-way through its policy year before the mistake was brought to Crum & Forster's attention. That is just not how property insurance works. Crum & Forster's policy number BAK-56503-2 covered property, not people, and the property it covered was the AgCo farm equipment.

54. Nor do the facts point to an innocent oversight. IOC had plenty of opportunity to consult and confirm the identity of the correct farm equipment with their client TJF. One phone call would probably have done it. Ms. Ashley's updated equipment information was detailed and thorough, with precise AgCo model descriptions and lengthy serial numbers

---

[21] Size is an important underwriting consideration given that farm equipment frequently travels on major roads. The larger or wider the equipment, the more space it takes up on a road, and the higher the risk of an accident.

[22] See, for example, "AGCO and New Holland combines see updated designs", Glacier Farmmedia; "Combine Header Types & When To Use Them", Machine4u; "How Much Does a Combine Harvester Cost? Harvester Financing", Charter Capital; "How to Choose The Suitable Combine Harvester For Your Farm", Estes Performance; "List of Top Combine Harvester Manufacturers", ItStillRuns.

that differed significantly from those of the 2013 New Holland combine covered in the BAK-56503-1 policy (2013 AgCo Gleaner, serial number RS7700DHTV7177, and a 2012 AgCo Gleaner Header, serial number 92500CHD1576 vs. a 2013 New Holland Combine, Model CR7090, serial number YDG116796 and no mention of a header). The values were different too. The AgCo Gleaner had a value of $180,000, while the New Holland combine had a value of $150,000. I can only conclude that Ms. Ashley was very deliberate in her instructions to RT, particularly given her follow-up instruction to reduce the policy limits from $280,000 to $210,000 – that being nothing more than the value of the AgCo equipment.

55. Most importantly, the mistake here was not mutual in nature. The parties did not share a common understanding. This was IOC's mistake, and IOC's alone. Crum & Forster had absolutely no reason to suspect that a mistake had been made at the time of underwriting the AgCo Gleaner and Header. Indeed, they had no knowledge of the mistake until five months later, and after the loss was reported, when IOC informed the company of its mistake. IOC's instructions were clear, detailed, and precise and Crum & Forster underwrote exactly what it had been asked to underwrite.

56. I would also add that, had Plaintiffs read the policy at the time of issuance, neither IOC nor its client should have had any false ideas or illusions about what the policy covered. The policy is clear on its face:

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## CONTRACTORS EQUIPMENT COVERAGE DECLARATIONS

This coverage part consists of this Declarations form, the Common Policy Conditions, the Contractors Equipment Coverage Form and the endorsements indicated as applicable.

**POLICY NUMBER: BAK-56503-2**
**NAMED**
**INSURED: Adam**
**Jones**
**DBA:       Triple J**
**Farms**

| LIMITS OF INSURANCE | |
|---|---|
| **Scheduled** | **Limit of Insurance$** |
| 1  Combine/RS7700DH17177/2013/AgCo  Gleaner | 180,000 |
| 2  Header/92500CHD01576/2013/AgCo  Cleaner | $ ~~30,000~~ |
| 3 | $ |
| 4 | $ |
| 5 | $ |
| **Unscheduled** | N/A |
| **All Covered Property in Any One Occurrence** | $        210,000 |

The coverage declaration is clear, concise, easy to read, and has no buried fine print. What is covered is the AgCo equipment, and the AgCo equipment only.

57. I also think that the Plaintiffs' argument that TJF did not own any AgCo equipment and, hence, had no insurable interest in any AgCo equipment smacks of disingenuousness. If nothing else, it obscures the fact that, in May of 2020, IOC did inform RT that TJF had leased the very same AgCo equipment (with matching descriptions and serial numbers) that IOC requested coverage for in policy number BAK-56503-2. There was simply no way Crum & Forster could have known or even suspected that TJF had no insurable interest in that equipment.  In any event, the policy states that the:

> **E. Loss Payment**
> .....
> **2. We will not pay you more than your financial interest in the Covered Property.** (Emphasis added)

If TJF indeed had no financial interest in the equipment covered, then the payment would be zero.

58. Based on the evidence aforesaid, as well as my experience, investigation, and analysis I offer the following opinion:

**OPINION 1:**
**Defendant Crum & Forster relied on IOC's submission of the farm equipment items to be covered, and any mistake in identifying the correct farm equipment to be covered is solely the mistake of one or both Plaintiffs and not Crum & Forster.**

59. I would also add that IOC seemed to ignore its own client's requests for assurances that appropriate coverage for his farm equipment was in place. IOC never added a New Holland header. Its personnel seemed confused about coverage.  IOC never responded

to two attempts by RT to procure updated equipment information, one in August of 2020 and the other in early October of 2020. IOC was aware of the BAK-56503-1 policy's expiration date and yet it allowed the policy to expire. Even though the policy had expired for several days, however, Crum & Forster accommodated a renewal and indeed a retroactive renewal. Crum & Forster had no reason to suspect that IOC had gotten it entirely wrong. They did what IOC asked them to do at all times.

60. When informed of the fire, Crum & Foster's helpful,[23] prompt, and thorough investigation also leads me to believe that the claim was handled well within regulatory and industry standards for claims handling. Throughout the course of investigating the claim, Crum & Forster searched for evidence that would support payment of the claim. Crum & Forster engaged outside legal counsel to assess the merits of the claim before denying the claim. The company investigated the claim with thoroughness and promptness.[24] It also agreed to cancel the policy to inception to enable the return of the premium to TJF.

61. Based on the evidence presented, as well as my experience, investigation, and analysis, I offer a second opinion:

**OPINION 2:**

**The Defendant Crum & Forster acted with integrity, honesty, promptness, thoroughness, and sincerity in its conduct with the Plaintiffs.**

62. Moreover, IOC had an obligation to ensure that detailed, accurate, material, and complete information related to the risk be submitted to an insurer. That is what retail brokers do and are supposed to do. That is one of the reasons clients hire a retail broker. Insurance underwriters, in turn, rely on that information. IOC could have easily reviewed the policy, long before the fire, and detected its mistake. Indeed, TJF also had an obligation to read and review his policy.

63. One look at the policy by IOC would have served to remind its client to read the policy. The endorsement covering the AgCo farm equipment specifically reads in large and bold print at the very top:

[23] See, for instance, CF-00115.
[24] See Para. 44 and 45 herein.

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.[25]

64. If TJF had any difficulty understanding the policy, it could have turned to IOC staffers, two of whom, Ms. Henry and Ms. Ashley, hold themselves out as farm insurance specialists, and an excess and surplus lines specialist, respectively. I have seen no evidence to suggest that anything or anyone prevented TJF from reviewing the policy. He could have asked his broker if clarifications were needed. He had a period of grace during which he could have cancelled the policy. Instead, both Plaintiffs waited for five months, and only after the fire loss had occurred, to inform themselves of the overage.

65. Hence, based on the evidence presented as well as my experience, investigation, and analysis, and speaking especially as a former regulator, I offer a third opinion:

**OPINION 3:**
**Plaintiffs had an obligation to provide correct and accurate information to Crum & Forster during the application process, and to read and review the Crum & Forster insurance policy in a timely manner to address any potential issues.**

66. I conclude with the following observations. Reforming this policy given the circumstances of this case would upend one of the cornerstones of insurance. A fundamental element of insurance is fortuity. For insurance to be feasible, two fundamental conditions are required: (1) only future accidental losses can be covered, and (2) such losses must pertain to whatever is covered.

67. In the case at hand, the insurance coverage declaration covers only the AgCo equipment. The Plaintiffs, however, maintain that their intention was to cover the 2013 New Holland combine and 2008 New Holland header and, presumably, Crum & Forster should have realized this because the BAK-56503-1 policy covered the combine, even though it certainly did not even mention a header. However, that policy had expired months before the loss, and months before IOC informed Crum & Forster of its mistake. Once that happened, TJF had no coverage whatsoever. The contractual provisions of an expired policy do not carry over to a new policy. TJF went "bare" for about a week or so with no insurance coverage whatsoever.

---

[25] See Document Production IOC-0094

68. The Crum & Forster policy, numbered BAK-56503-2, clearly states:

> **Coverage**
>
> **We will pay for <u>direct physical loss of or damage to Covered Property</u> from any of the Covered Causes of Loss.** (Emphasis added)

AgCo equipment is the "Covered Property" and, as far as covered causes of loss are concerned, the policy states:

> **Covered Causes Of Loss**
>
> **Covered Causes of Loss means <u>Risks Of Direct Physical Loss Or Damage to Covered Property</u> except those causes of loss listed in the Exclusions.** (Emphasis added)

However, the direct physical loss or damage in this case was not to the "Covered Property", that being the AgCo equipment. The damage was to New Holland equipment. There is no mention of New Holland equipment in BAK-56503-2 as "Covered Property". So, the question is: how was Crum & Foster expected to underwrite the policy in accord with IOC's supposedly real, but to Crum & Forster unknown, intentions with respect to "Covered Property." IOC had clearly communicated - and confirmed - its instructions to insure the AgCo equipment as "Covered Property."

If one were to accept Plaintiffs' argument that intention is good enough to get coverage through reform, then every insured who suffered a loss could claim that any property, whether "Covered Property" or not, should in fact be covered simply because he or she intended it to be covered. Surely, such a result would violate the whole notion of fortuity.

69. I would add that I am certain that Crum & Forster's reinsurers, and all other reinsurers doing business in the United States, would surely take notice if the company were to pay a claim for property that was never underwritten to a policy. And, as a former regulator, I am certain that so would insurance regulators.

70. Hence, based on the evidence presented, as well as my experience, investigation, and analysis, and particularly my experience as a former regulator, I conclude with the following opinion:

**OPINION 4:**
**Given the circumstances of this case, reforming the insurance policy post-loss would undermine fundamental aspects of insurance, and would have a profound effect on the availability and pricing of reinsurance and on insurance regulation.**

# V. COMPENSATION

71. For my work on this report, I am being compensated at a rate of $400 an hour plus reimbursement of expenses, including travel.

Dated September 13, 2022

*E. N. Csiszar*

ERNEST N. CSISZAR

# EXHIBIT 1

**Ernest N. Csiszar**                                          Phone: 847.224.2783
1579 Kathwood Drive
Columbia, SC 29206
ernst.csiszar@yahoo.com

---

## PROFESSIONAL HIGHLIGHTS

---

**EXPERT WITNESS EXPERIENCE**                                          2009 - Present
Serve as expert witness in insurance-related litigation, regulatory matters, and legislative hearings.

**ENC ADVISORY SERVICES**                                          2009 – Present
**Principal**
Advise insurance groups on various business, financial and regulatory matters including business strategies, mergers and acquisitions, licensing, market conduct rate and form filings and other matters

**SC LAUNCH, Columbia, SC**
**Director**
The organization is the venture capital arm of the South Carolina Research Authority.          2015 - 2017

**MASTEC, INC.**                                          2006– Present
**Director**
Member of the Audit Committee for MasTec, Inc., a NYSE listed Fortune 500 specialty contractor for communications companies, the oil and gas business, utilities and governments throughout the United States, Canada
and Mexico

**AMERICAN INTEGRITY INSURANCE COMPANY OF FLORIDA**                    2012 - Present
**Director**
The company underwrites property and casualty insurance products.

**PATRIOT NATIONAL GROUP INC.**                                          2017 - 2018
Director
The company services the insurance industry.

**PHTS SERVICES, Ltd.**                                          2009 - 2017
**Director**
The company is a service provider to the healthcare industry in South Carolina.

**THE NELSON TAPLIN GOLDWATER GROUP**                                          2010 - 2018
**Advisor**
The company provides regulatory compliance services to the insurance industry, including regulatory compliance for property and casualty, life and annuities, and benefits and health care providers.

**R STREET INSTITUTE, Washington, DC**                                          2013 - 2018
**Associate Fellow**
The organization provides insurance-related research for all segments of the industry, including property and casualty, life and annuities, and benefits and health care providers

**UNIVERSITY OF SOUTH CAROLINA, MOORE SCHOOL OF BUSINESS**                    2008 - 2015
**Retired as Clinical Professor of Finance**
Teaching and research related to insurance and the management of risk and uncertainty

**BRIDGE STRATEGY GROUP**                                          2008 - 2015

**Insurance Director**
Senior Advisor
The company provides management consulting services to financial institutions and other industries.

| | |
|---|---|
| **GUARANTEE INSURANCE GROUP, INC.** | 2011 - 2016 |
| **ASHMERE INSURANCE GROUP, INC.** | 2016 – 2017 |

**Director**
The companies underwrite property and casualty insurance products.

**SOUTH CAROLINA ALLIANCE OF HEALTH PLANS**                    2015 - 2016
**Regulatory and legislative advisor**
The organization represents commercial health plans, Medicaid managed care organizations and other industry stakeholders in seeking market driven innovation and solutions to health care.

**STATES ALLIANCE FOR BALANCED INSURANCE REGULATION (SABIR)**          2010 - 2015
**Chairman**
SABIR is an association of insurers from all sectors of the industry as well companies that serve the insurance industry.  The association supports improving state-based regulation of the industry rather than federal regulation of insurance.

**COLUMBIA COLLEGE, Columbia, SC**                                    2013
Professor of International Business
Teaching graduate course in International Business and Global Leadership

**SENTINEL HOLDINGS LIMITED**                                        2007
**Executive Chairman**
Assisted in organizing and capitalizing a start-up operation in the alternative risk insurance and reinsurance market.

**STATE of SOUTH CAROLINA DEPARTMENT of INSURANCE – Columbia, SC**      1999 – 2004
**Director**
Responsible for leading and developing a staff of over 100 employees.  Responsible for overseeing and regulating every aspect of the insurance industry within South Carolina, including property and casualty, life and annuities, and benefits and health care operations.

**SEIBELS BRUCE GROUP, INC. – Columbia, SC**                          1993 – 1998
**President & Chief Executive Officer**
Responsible for managing a $200MM insurance company which included property and casualty and life and annuities operations.  Responsible for developing a revised financial strategy leading to the turnaround to profitability and stability of the company.

**CG ASSOCIATES – Columbia, SC**                                     1988 - 1995
**Managing Director**
Management consulting practice specializing in mergers and acquisitions.  Clients included Harris Corporation, Alcatel and Seibels Bruce Group.

**HOLBORN HOLDING CORPORATION – Geneva, SWITZERLAND**                  1979 - 1988
**Partner and Managing Co- Director**
Merchant banking and trading activities in Europe, North America, Caribbean and Far Eastern Regions. Specifically responsible for merchant banking and project finance activities in the Middle East, Far East. and North America including investments and financing in large commercial, industrial and construction projects.

**BONDY, KIRWIN & CSISZAR LAW FIRM – Windsor & Toronto, Ontario, CANADA**     1977 - 1984
**Partner**
Commercial and corporate law practice focusing on financing, investing and trading activities.

Case 7:22-cv-00025-FL    Document 53-15    Filed 02/23/23    Page 28 of 34

**McTAGUE-CLARK LAW FIRM – Windsor, Ontario, CANADA**          1974 - 1977
**Associate**
Commercial and corporate law practice focusing on taxation issues.

---

## ACADEMIC EXPERIENCE

**COLUMBIA COLLEGE, Columbia, SC**
2013
**Professor of International Business**
Teaching graduate course in International Business and Global Leadership

**The UNIVERSITY OF SOUTH CAROLINA SCHOOL of BUSINESS – Columbia, SC**
1988 - 1996
**Visiting Assistant Professor of Management**
**Candidate in Doctor of Philosophy Program in Management**
PhD studies with a concentration in Mergers & Acquisitions

**The UNIVERSITY OF WINDSOR SCHOOL OF LAW – Windsor, Ontario, Canada**
1976 - 1982
**Lecturer in Taxation and Advanced Taxation Law**

---

## ASSOCIATION / ORGANIZATION EXPERIENCE

**PROPERTY and CASUALTY INSURERS of AMERICA – PCI**
2004 - 2006
**President and CEO**
Responsible for leading the largest property and casualty insurance association with over 1100 member companies. PCI provides information, compliance and regulatory / legislative advocacy services to its members. PCI is the successor organization to the merger of The National Association of Independent Insurers, (NAII), and The Alliance of American Insurers, (AAI).

**NATIONAL ASSOCIATION OF INSURANCE COMMISSIONERS (NAIC) – Kansas City, KS**
1999 - 2004
**President 2004**
**Vice President 2003**
**Secretary Treasurer for part of 2003**
Responsible for leading the organization in 2004.

**Committee Memberships**
- International Insurance Relations – Chairman
- Executive Committee – Chairman
- Health Insurance Task Force
- Reinsurance Task Force
- Liaison with Federal Regulators Working Group
- NAIC/Industry Liaison Group
- Life Insurance and Annuities Committee

**THE UNITED STATES DEPARTMENT OF COMMERCE**
**UNITED STATES AGENCY FOR INTERNATIONAL DEVELOPMENT**
1999 – 2004
**Advisor, Developing Nations' Initiatives**
Served as lead negotiator and advisor on a variety of insurance related issues in Morocco, Egypt,

Kazakhstan and China. Conducted liaison work with the United Kingdom, South and Central American, Chinese and Japanese regulatory agencies.

**INTERNATIONAL ASSOCIATION OF INSURANCE SUPERVISORS (IAIS) – Basel, Switzerland**
1999 - 2004
**United States NAIC Representative to the IAIS**
**Chairman of the IAIS Reinsurance Committee**
**Chairman of the IAIS Securitization Sub-Committee**
**IAIS and NAIC Representative / Advisor to the Basel Committee's Financial Stability Forum and the OECD**

## PUBLICATIONS

An Update on the Use of Modern Financial Instruments in the Insurance Sector (E.N. Csiszar, June 2007 Geneva Papers)

The Question of Reputational Risk; Perspectives from an Industry (E.N. Csiszar and Gregory W. Heidrich, 2006 Volume 31 Geneva Papers

Issues Relating to Collateral Requirements Imposed upon Alien Reinsurers of United States Ceding Insurers (E.N. Csiszar, July 2005 Geneva Papers

Comments on "One Region, One Money". Implications of Regional Currency Consolidation for Financial Services (E.N. Csiszar, 2002 Volume 27 Geneva Papers

An Integrative Framework for Creating Value Through Acquisitions (E.N. Csiszar, 1993 Handbook of Business Strategy)

Implementing International Mergers and Acquisitions (E.N. Csiszar, et.al., 1993 Human Resource Planning)

A Strategic Approach to Implementing Mergers and Acquisitions (E.N. Csiszar, et.al., 1992 Bocconi University Press, Italy)

Contributions to professional journals including National Underwriter, Reactions and Risques.

## EDUCATION

The UNIVERSITY OF WINDSOR SCHOOL OF LAW - Windsor, Ontario, Canada
Bachelor of Laws (LL.B.) 1974

The UNIVERSITY OF WINDSOR – Windsor, Ontario, Canada
Bachelor of Arts, Mathematics and Philosophy 1971

# EXHIBIT 2

SUMMARY OF EXPERT SERVICES IN OTHER CASES

In the past five years, I have testified as an expert witness in the following cases:

1.　Johnson et al. vs. Allstate Insurance Company, United States District Court, Southern District of Illinois, Cause No. 3:07-CV-00781-MJR-PMF; For the Defendant. Counsel: Sonnenschein, Nath and Rosenthal.

2.　RHS Enterprises vs. Lockton Risk Services, Inc., United States District Court, District of South Carolina, Cause No. 6.09-CV-1325-RBH. For the Defendant Lockton. Counsel: Womble Carlyle.

3.　Bradford & Bradford, P.A. vs. Attorneys Liability Protection Society, Inc., Risk Retention Group, United States District Court for the District of South Carolina, Rock Hill Division, C.A. No. 0:09-CV-02981-CMC. For the Defendant. Counsel: Womble Carlyle.

4.　ATS Intermodal, LLC and Garland B. Beasley et al. vs. Continental Casualty Company, United States District Court for the Middle District of Georgia, Columbus Division, C.A. No. 4:10-cv-19(CDL). For the Defendant. Counsel: Seyfarth Shaw.

5.　Danielle Weekes vs. Ohio National Life Assurance Company, United States District Court for the State of Idaho, Cause No. 4:10-cv-00566-BLW. For the Defendant. Counsel: Eberle, Berlin.

6.　In re National Western Life Insurance Deferred Annuities Litigation, United States District Court for the Southern District of California, Case No. 05-CV-1018-AJB(WVG). For National Western. Counsel: Barger & Wolen.

7.　Atlas Resources, Inc. vs. Liberty Mutual Insurance Company, United States District Court for the District of New Mexico, Case No. 1:09-cv-01113-WJ-WDS. For the Plaintiff. Counsel: Eberle, Berlin.

8.　Mary K. Mungo vs. CFMG Life insurance Company F/K/A CUNA Mutual Insurance Society, CUMIS Insurance Society, Inc., and Founders Federal Credit Union, United States District Court for the District of South Carolina, Rock Hill Division, Case No. 011-cv-00464-MBS. For the Defendants CUNA and Founders. Counsel: SNR Denton.

9.　Starr International Company vs. The United States of America, United States Court of Federal Claims, No. 11-CV-00779(TCW). For the Plaintiff Starr International Company. Counsel: Boies Schiller.

10.　South Carolina Farm Bureau Mutual Insurance Company vs. Robert Sease, Court of Common Pleas, County of Orangeburg, State of South Carolina, Civil Action No: 2013-CP-38-00731. For the Defendant. Counsel: Adam Ness.

11. Melissa Whitaker vs. Protective Life Insurance Company and Edward Jones, United States District Court for the District of South Carolina, Greenville Division, Case No: 6:10-2314-HFF. For the Defendant Protective Life Insurance Company. Counsel: Maynard Cooper.

12. Stevens Aviation, Inc. vs. TKC Aerospace, Court of Common Pleas, State of South Carolina, County of Greenville, C.A. No. 2013-CP-23-02318. For the Defendant. Counsel: Wyche P.A.

13. Senior LS Holdings, LLC vs. Aviva Life and Annuity Company of New York, District of South Carolina, Greenville Division, Civil Action No. 6:13-cv-02944-TMC. For the Defendant. Counsel: Womble Carlyle.

14. Eagan Insurance Limited and AIG ats. Eudy, United States District Court for the District of South Carolina, Charleston Division, Civil Action 2:15-cv-1944-PMD. For the Defendant Eagan Insurance. Counsel: Sweeny, Wingate & Barrow, PA.

15. Meade Communities LLC vs. AMBAC Assurance Corporation, in the Circuit Court for Anne Arundel County, Maryland, Civil Action 02-cv-15-003745. For the Plaintiff/Counterclaim Defendant Meade Communities LLC. Counsel: Kirkland & Ellis.

16. Earnest et al. ats. Security National Insurance Co., in the United States District Court for the District of South Carolina in the Greenville Division, Civil Action no. 6:17-cv-00011-MGL. For the Defendant Earnest. Counsel: Deborah B. Barbier, Attorney at law.

17. Corriher et al. ats. Security National Insurance Co., in the United States District Court for the District of South Carolina in the Greenville Division, Civil Action no. 6:17-cv-00011-MGL. For the Defendant Corriher. Counsel: James, McElroy & Diehl. P.A.

18. Thomas Grubb, Absolute Insurance Services, Gracechurch Associates, Inc. and Certain Underwriters at Lloyd's, London ats. 626 North Front Street T/A/ Aura, Philadelphia County Court of Common Pleas, Philadelphia County, September Term 2015, No. 1322. For the Defendant s Thomas Grubb and Absolute Insurance Services. Counsel: Sweeney & Sheehan, a Professional Corporation.

19. Protective Life Insurance Company ats. Apex Parks Group, LLC, in the Circuit Court of Jefferson County, Alabama, Birmingham Division, Civil Action No. CV-2017-000165. For the Defendant Protective Life Insurance Company. Counsel: Maynard, Cooper & Gale, PC.

20. Universal Insurance Company of North America ats. Timothy T. Ingersoll, in the United States District Court for the District of South Carolina, Florence Division, Case No.: 4:16-cv-o3827-RBH. For the Defendant Universal Insurance Company of North America. Counsel: Sweeny, Wingate & Barrow, PA.

21. Aviva Life and Annuity Company et al. ats. William Wicklund et al., in the Circuit Court of Pulaski County, Arkansas, Third Division, Case No.: 60CV-2011 2581. For the Defendant Aviva Life and Annuity Company. Counsel: Maynard Cooper.

22. Keenan & Suggs ats. Safe.Rack, LLC, in the Court of Common Pleas, in the County of Richland, South Carolina, Case No.: 2015-CP-40-3149. For the Defendant Keenan & Suggs. Counsel: Sweeny, Wingate & Barrow, PA.

23. Colony Insurance Company v. Hucks Pool Company, Inc. and Jeffrey Mann, in the United States District Court for the District of South Carolina, Florence Division, Case No.: 4:17-cv-02014-RBH. For the Plaintiff Colony Insurance Company, Counsel: Sweeny, Wingate & Barrow, PA.

24. Texas Farm Bureau et al. ats. Ferguson in the United States District Court for the Western District of Texas, Waco Division, Civil Action No. 6:17-cv-00111-ADA. For the Defendants. Counsel: Carlton Fields.

25. Florida Farm Bureau et al. ats. Yoder, in the United States District Court for the Northern District of Florida, Gainesville Division, Case No.:1:19-cv-00070-AW-GRJ. For the Defendants. Counsel: Carlton Fields.

26. Mississippi Farm Bureau et al. ats. Cook, in the United States District Court for the Northern District of Mississippi, Aberdeen Division, Civil Action No.: 1:18-CV-76-GHD-DAS. For the Defendants. Counsel: Carlton Fields.

27. Mississippi Farm Bureau et al. ats. Britt, in the United States District Court for the Northern District of Mississippi, Aberdeen Division, Civil Action No.: 1:18-cv-38-GHD-DAS. For the Defendants. Counsel: Carlton Fields.

28. In re: Asbestos personal injury litigation coordinated docket case number: 2020-cp-40_04385 Court of Common Pleas, Fifth Judicial Circuit, County of Richmond, State of South Carolina. For the Defendant Arrowood Indemnity Company. Counsel: Dentons.

29. McGriff, Seibels & Williams, Inc. ats. HAT Investments et al., in the United States District Court, District of South Carolina, Spartanburg Division, Action No. 7:18-cv-03162-HMH. For the Defendant. Counsel: Womble Bond Dickinson (US) LLP.

30. McGriff Insurance Services, Inc. f/k/a BB&T Insurance Services, Inc. ats. Pelican Watch Homeowners Association, Inc., General Court of Justice, Superior Court Division, County of Hanover, State of North Carolina, Action No. 19-CVS-1701. For the Defendant. Counsel: Womble Bond (US) LLP.

31. Texas Farm Bureau Casualty Insurance Company et al. ats. English et al., in the United States District Court for the Western District of Texas, Waco Division, Case No.: 6:17-cv-00323-ADA-JCM. For the Defendant. Counsel: Carlton Fields.

32. John Hancock Life Insurance Company (U.S.A.) et al. ats. Wright, in the United States District Court, District of South Carolina, Columbia Division, Civil Action No. 3:21-cv-01611-JMC. For the Defendant. Counsel Womble Bond Dickinson, LLP.

# EXHIBIT 3

# MATERIAL CONSIDERED

1. Complaint

2. Answer, Affirmative Defenses and Counterclaim

3. Answer to Counterclaim

4. Plaintiffs' Rule 26 Initial Disclosures

5. Defendant's Rule 26 Initial Disclosures

6. Plaintiffs' Expert Report and exhibits

7. Insurance of the Carolinas Document Production BATES 0001-0321

8. Crum & Forster Document Production BATES CF_00001-CF_00123

9. Crum & Forster Policy number BAK-56503-1

10. Crum & Forster Policy number BAK-56503-2

11. Underwriting File for Policy number BAK-56503-1

12. Underwriting File for Policy number BAK-56503-2

13. Letters exchanged between counsel for IOC and TJF and counsel For Crum & Forster

14. , "AGCO and New Holland combines see updated designs", Glacier Farmmedia

15. "Combine Header Types & When To Use Them", Machine4u

16. "How Much Does a Combine Harvester Cost? Harvester Financing", Charter Capital

17. "How to Choose The Suitable Combine Harvester For Your Farm", Estes Performance; "List of Top Combine Harvester Manufacturers", ItStillRuns